## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## AT NASHVILLE

| | |
|---|---|
| ALISON ROAN, by her conservator ROSEMARIE ROAN,<br><br>　　　Plaintiff,<br><br>v.<br><br>DR. WENDY LONG, in her official capacity as the Deputy Commissioner of the Tennessee Department of Finance and Administration and Director of the Bureau of TennCare and LARRY B. MARTIN, in his official capacity as Commissioner of the Tennessee Department of Finance and Administration,<br><br>　　　Defendants. | Civil Action No.＿＿＿＿＿<br><br><br><br>**VERIFIED COMPLAINT FOR<br>DECLARATORY AND<br>INJUNCTIVE RELIEF** |

## A. **INTRODUCTORY SUMMARY**

1.　　The plaintiff, Alison Roan, just turned 21. Born with severe developmental disabilities, her fragile health has only declined with the passage of time. For ten years, the State has agreed that Ms. Roan requires around-the-clock professional nursing care to survive. For ten years, Tennessee's Medicaid program, known as TennCare, has agreed that the least costly place to provide that care is at home with her devoted family. Now that she has turned 21—and only because she has turned 21—a state rule dictates that TennCare only provide her the nursing care she needs in an institution. If she and her family insist on staying together, the State will cut her nursing care below the minimum required to ensure Ms. Roan's survival.

2.　　According to Alison's doctor, the nursing care she requires is equivalent to hospital intensive care unit care with one-to-one nursing support. The continuous home nursing she has been receiving has enabled her to remain at home, but any reduction of such care could

be lethal, as "an event of mucus plugging or other respiratory complication would result in respiratory failure or death for Alison before emergency personnel could respond to a 911 call to the house. Decreasing her home health nursing hours will significantly increase her risk for morbidity and mortality and increase hospitalizations . . .." [Declaration of Dr. Rebekah F. Brown, December 15, 2017, Attachment C to this Complaint].

3.      The State nonetheless refuses to cover more than 19 hours per day of nursing care if she remains at home. TennCare will, however, provide continuous round-the-clock one-on-one nursing care in a hospital intensive care unit as needed, without any limit other than that it be medically necessary. Thus, Alison is facing the prospect of being forced to leave her family home and enter a restrictive, segregated intensive care unit, which is the only setting outside of her home in which she could receive the one-on-one nursing services she requires to stay alive.

4.      Alison seeks an injunction to prevent the Defendants' violation of the Americans with Disabilities Act, which protects her from the isolation and anguish that are inflicted by needless institutionalization. At issue is not *whether* TennCare will cover the services Alison requires, but only *where* it will provide the services. The TennCare rules decree that the location must be a hospital. On the facts of this case, the ADA supersedes the state rules and protects her ability to continue to receive needed care at home with her family.

### B.  JURISDICTION AND VENUE

5.      Jurisdiction is conferred on this Court by 28 U.S.C. § 1331, which provides for original jurisdiction over all civil suits involving questions of federal law; 42 U.S.C. § 12133, which provides for original jurisdiction over actions arising under Title II of the ADA; and 28 U.S.C. § 1343(3) and (4), which provides for original jurisdiction in all actions authorized by 42

2

U.S.C. § 1983 to redress the deprivation under color of State law of any rights, privileges, or immunities guaranteed by the U.S. Constitution and Acts of Congress.

6.       Plaintiff seeks declaratory, injunctive, and other appropriate relief, pursuant to 28 U.S.C. §§ 2201 and 2202; Fed. R. Civ. P. 57; 42 U.S.C. § 1983 and 42 U.S.C § 12132.

7.       Venue is proper pursuant to 28 U.S.C. § 1391(b), because a substantial part of the events or omissions giving rise to the claims occurred in this District.

## C. PARTIES

8.       Plaintiff Alison Roan is an adult resident of Murfreesboro, Rutherford County, Tennessee. As authorized by Fed. R. Civ. P. 17(c)(1)(C), she brings this action through her mother, Rosemarie Roan, who was appointed Alison's conservator by order of the Chancery Court for Rutherford County, Tennessee.[1]

9.       Defendant Dr. Wendy Long is sued in her official capacities as Deputy Commissioner of the Tennessee Department of Finance and Administration (DFA) and Director of that Department's Division of Health Care Finance and Administration (HCFA). Deputy Commissioner Long oversees all of the health care related divisions within the DFA, including the Bureau of TennCare (the "Bureau").

10.      Defendant Larry B. Martin is sued in his official capacity as the Commissioner of the Tennessee DFA, of which HCFA and the Bureau are subordinate agencies. DFA is Tennessee's "single state agency," within the meaning of 42 U.S.C. § 1396a(a)(5) and 42 C.F.R. § 431.10, that is responsible for administering the TennCare program. The Bureau is the division of DFA that directly manages TennCare.

---

[1].    To distinguish the plaintiff from her conservator, the plaintiff is referred to by her first name.

3

## D. THE AMERICANS WITH DISABILITIES ACT

11.     Title II of the Americans with Disabilities Act (ADA) prohibits discrimination

against people with disabilities by any public entity:

> [N]o qualified individual with a disability shall, by reason of disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity or be subjected to discrimination by such entity.

42 U.S.C. § 12132.

12.     Title II of the ADA defines a "qualified individual with a disability" as one who,

"with or without reasonable modifications to rules, policies, or practices . . . meets the essential

eligibility requirements for the receipt of services or participation in programs or activities

provided by a public entity." 42 U.S.C. § 12131(2).

13.     The term "public entity" is defined to include "any State or local government," as

well as "any department, agency, special purpose district or other instrumentality of a State . . .

or local government." 42 U.S.C. § 12131(1)(a)(A), (B).

14.     Pursuant to Title II, the Attorney General has promulgated regulations requiring

public entities to "administer services, programs, and activities in the most integrated setting

appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d).

15.     Federal regulations also provide that public entities "may not, directly or through

contractual or other arrangements, utilize criteria or other methods of administration: (i) that

have the effect of subjecting qualified individuals with disabilities to discrimination on the basis

of disability; [or] (ii) that have the effect of defeating or substantially impairing accomplishment

of the objectives of the entity's program with respect to individuals with disabilities . . .." 28

C.F.R. § 35.130(b)(3).

4

16.     The Department of Finance and Administration is a public entity under Title II of the ADA and its implementing regulations.

### E.     OVERVIEW OF THE TENNCARE PROGRAM

17.     Title XIX of the Social Security Act, known as the Medicaid Act, provides medical assistance to certain eligible individuals. 42 U.S.C. § 1396. The purpose of Medicaid is to furnish, as far as practicable, "medical assistance on behalf of . . . aged, blind, or disabled individuals, whose income and resources are insufficient to meet the costs of necessary medical services" and "to help such families and individuals to *attain or retain capability for independence or self-care* . . .." 42 U.S.C. § 1396 (emphasis added).

18.     Medicaid is administered at the federal level by the Centers for Medicare & Medicaid Services (CMS) of the Department of Health and Human Services (HHS). Pursuant to the ADA, CMS has urged states to avoid unnecessary institutionalization of persons with disabilities, telling state Medicaid directors that "no one should have to live in an institution or a nursing home if they can live in the community with the right support." (Dear State Medicaid Director letter, January 14, 2000.)

19.     Each state decides whether to participate in the Medicaid program, and all 50 states do. Tennessee has participated in Medicaid continuously since 1968. Once a state elects to participate in Medicaid, it must administer the program subject to federal requirements imposed by the Medicaid Act and its implementing regulations and the ADA and its implementing regulations.

20.     Each participating state must designate a "single state agency" to administer the program consistent with federal law. 42 U.S.C. § 1396a(a)(5). By executive order dated October

5

19, 1999, the Department of Finance and Administration (DFA) became the designated single state agency in Tennessee.

21.     In 1993, Tennessee obtained from the Secretary of HHS a Medicaid demonstration waiver under Section 1115 of the Social Security Act, 42 U.S.C. § 1315. The waiver permitted the State to replace its conventional Medicaid program with a demonstration program called TennCare. The five-year waiver was implemented in January 1994 and has been periodically revised and renewed since then pursuant to 42 USC § 1396n. Pursuant to the waiver, all TennCare covered services are now managed by private intermediaries that subcontract with health care providers. The intermediaries are known as managed care organizations, or MCOs. Defendant state officials retain a non-delegable responsibility for ensuring compliance with all applicable federal laws.

22.     The federal waiver exempts the demonstration program from compliance with only a few specified federal Medicaid statutes and rules. All laws and rules not explicitly waived remain fully applicable to TennCare. None of the laws and regulations at issue in this case has been waived, and all remain fully effective in Tennessee.

23.     States participating in the Medicaid program must cover certain mandatory services for most Medicaid beneficiaries. *See* 42 U.S.C. § 1396a(a)(10)(A)(i)(incorporating 42 U.S.C. § 1396d(a)(1)-(5), (17), (21)). The Medicaid Act also allows states to cover certain other services at state option. *Id.* Under the Medicaid Act's early and periodic screening, diagnosis, and treatment (EPSDT) mandate, states must cover all medically necessary services, mandatory and optional, listed in the Act at 42 U.S.C. § 1396d(a) (listing 29 service categories) for children under the age of 21, regardless of whether a state has chosen to cover optional services for adults. 42 U.S.C. § 1396d(r)(5).

6

24.     Each service covered in a state's Medicaid State Plan must be sufficient in amount, duration, and scope to reasonably achieve its purpose. 42 U.S.C. § 1396a(a)(10)(B), 42 C.F.R. § 440.225.

25.     A state may not arbitrarily deny or reduce the amount or scope of a covered service based solely on the diagnosis or type of illness or condition of the Medicaid recipient. 42 C.F.R. § 440.230(c).

26.     Medicaid regulations allow states to place appropriate limits on covered services based on "medical necessity." 42 C.F.R. § 440.230(d).   Under TennCare rules, a service is medically necessary if it satisfies each of the following criteria:

    (a)     It must be recommended by a licensed physician who is treating the enrollee or licensed healthcare provider practicing within the scope of his or her license who is treating the enrollee;

    (b)     It must be required in order to diagnose or treat an enrollee's medical condition;

    (c)     It must be safe and effective;

    (d)     It must not be experimental or investigational; and

    (e)     It must be the least costly alternative course of diagnosis or treatment that is adequate for the enrollee's medical condition.

TennCare Rule 1200-13-16-.05(1). TennCare will not pay for items or services that it determines not to be medically necessary. TennCare Rule 1200-13-16-.06(11).

27.     "Private duty nursing" is an optional service under the Medicaid Act. 42 U.S.C. § 1396d(a)(8), 42 U.S.C. § 1396a(a)(10)(A). Private duty nursing is defined as nursing services provided to persons "who require more individual and continuous care than is available from a visiting nurse or routinely provided by the nursing staff of the hospital or skilled nursing facility." 42 C.F.R. § 440.80. Under the regulation, a state has the option to provide private duty

7

nursing services in the beneficiary's home, at a hospital, or at a skilled nursing facility. 42 C.F.R. § 440.80(c).

28.     TennCare provides private duty nursing services as medically necessary to children under 21 in accordance with EPSDT requirements. TennCare Rule 1200-13-13-.01(104)(d). For adults age 21 and over, TennCare provides private duty nursing only to those whose needs happen to be based on the following circumstances:

only when medically necessary to support the use of ventilator equipment or other life-sustaining medical technology when constant nursing supervision, visual assessment, and monitoring of both equipment and patient are required. For purposes of this rule, an adult is considered to be using ventilator equipment or other life-sustaining medical technology if he:

1.     Is ventilator dependent for at least 12 hours each day with an invasive patient end of the circuit (i.e., tracheostomy cannula); or

2.     Is ventilator dependent with progressive neuromuscular disorder or spinal cord injury, and is ventilated using noninvasive positive pressure ventilation (NIPPV) by mask or mouthpiece for at least 12 hours each day in order to avoid or delay tracheostomy (requires medical review); or

3.     Has a functioning tracheostomy:

    (i)     Requiring suctioning; and

    (ii)     Oxygen supplementation; and

    (iii)     Receiving nebulizer treatments or requiring the use of Cough Assist/ in-exsufflator devices; and

    (iv)     In addition, at least one subitem from each of the following items (I and II) must be met:

        (I)     Medication:

            I.     Receiving medication via a gastronomy tube (G-tube); or

            II.     Receiving medication via a Peripherally Inserted Central Catheter (PICC) line or central port; and

        (II)     Nutrition:

8

I.   Receiving bolus or continuous feedings via a permanent
     access such as a G-tube, Mickey Button, or
     Gastrojejunostomy tube (G-J tube; or

II.  Receiving total parenteral nutrition.

TennCare Rule 1200-13-13-.01(104)(c). For any other patient, like Plaintiff Alison Roan, whose

medical need for such services is equally acute but happens to be based on other diagnoses or

conditions, the rule denies coverage.

29.    TennCare operates a special program called Employment and Community First

(ECF) CHOICES to provide home and community-based long-term supports and services for

individuals with intellectual and developmental disabilities. ECF CHOICES provides home

health and private duty nursing services to some enrollees who are determined to need these

services, but the amount of these services available are limited by an annual expenditure cap.

The expenditure cap is based on an individual's assessed level of needs as defined in TennCare

rules. Individuals assessed to have a low or moderate level have an expenditure cap of $45,000

per year. Individuals assessed to have a higher level of need have an expenditure cap of $60,000

per year. TennCare Rule 1200-13-01-.31(4)(d)(1).

30.    TennCare may grant an exception to the expenditure cap for individuals assessed

to have exceptional medical needs. The annual expenditure cap for individuals granted an

exception is based on the average annualized cost of a comparable level of care in an institution.

For individuals with developmental disabilities, the annual expenditure cap is based on the

average annualized cost of nursing facility services plus the average annualized cost of

specialized services that a person with a developmental disability would be expected to need in a

nursing facility. TennCare Rule 1200-13-01-.31(4)(d)(1)(iii).

9

31.    "Inpatient hospital services" are mandatory services under the Medicaid Act. 42 U.S.C. § 1396d(a)(1); 42 C.F.R. § 440.10. TennCare covers such services as medically necessary, without numerical limit. TennCare Rule 1200-13-13-.04(1)(b)(12).

## F.  FACTUAL ALLEGATIONS

32.    Alison Roan lives at home with her parents and younger sister. Alison's mother works full-time providing care for adults with intellectual disabilities at a non-profit in Murfreesboro, Tennessee. Her father works 60 hours per week as a truck driver.

33.    Alison has suffered from serious chronic medical conditions and developmental disabilities since birth. During her birth, Alison went into respiratory distress and was placed in the Neonatal Intensive Care Unit at Vanderbilt Children's Hospital, where she would remain for the first three weeks of her life. She suffered her first seizure when she was only 36 hours old and those have continued to the present. Alison suffered brain damage, and she was diagnosed with cerebral palsy at three months old. At eleven months old, she was diagnosed with failure to thrive.

34.    In addition to cerebral palsy, Alison suffers from both restrictive and reactive lung disease and impaired innate airway clearance. These disorders increase her risk of respiratory and inflammatory reaction to illness, restrict her lung capacity, and make it difficult to manage her mucus secretions. Additionally, Alison is unable to adequately clear her airway by coughing due to low muscle tone caused by cerebral palsy. She is therefore constantly at risk of life-threatening respiratory distress. She requires daily airway clearance therapies and regular suctioning of mucus secretions, as well as oxygen therapy. Even with these therapies, she requires constant monitoring as her condition can change drastically minute-by-minute. She

10

sometimes expectorates large mucus plugs which obstruct her airway requiring immediate medical intervention. She is at heightened risk while sleeping due to sleep apnea.

35.     Alison also has Lennox-Gastaut Syndrome, a type of epilepsy with multiple types of seizures. She takes seizure medication and has been implanted with a vagus nerve stimulator to help control her seizure activity, but she still suffers from some form of seizure activity every day. Her seizures can be triggered by the touch of a hand or the switch of a light. When Alison's has a seizure, someone must be present to position her head so her airway is not blocked off.

36.     She also suffers from severe spasms caused by her cerebral palsy. When her spasms are especially strong, she moves her hand forcefully to her chin, cheek or chest bone which can result in fracture if someone is not present to intervene.

37.     Alison has had multiple orthopedic surgeries. At eleven months old, she underwent surgery for a Nissen fundoplication, a procedure that wrapped her stomach around her esophagus to treat the reflux of gastric acid. At five years old, she went into precocious puberty which caused both of her hip bones to be pulled out of socket and required hip surgery. Alison has diminished lung capacity due to her severe scoliosis. The severity of her scoliosis required full spinal fusion surgery when she was eleven years old. She contracted a strain of MRSA during that surgery and underwent two additional surgeries to kill the infection and save her life.

38.     Alison is unable to take food, liquids or medication by mouth due to a delay in her swallow mechanism. At eleven months old, a gastronomy tube was implanted which enables her to receive nutrition and medications directly to her stomach. She is at a high risk of aspiration and has been hospitalized three times this year due to bacterial and viral aspiration pneumonia.

11

39.     Alison is highly susceptible to infectious diseases and has been rendered home-bound since elementary school and is periodically required to be quarantined in her room away from her family.

40.     Alison currently receives 24/7 private duty nursing care paid for by TennCare. For more than a decade, TennCare and its managed care contractor have continually found such care medically necessary for Alison.

41.     Alison turned 21 in early October, 2017. On October 5, 2017, TennCare and its managed care contractor notified Alison that her 24/7 private duty nursing would not be covered after October 31, 2017.

42.     Appeals were filed on October 13, 2017, November 1, 2017 and November 9, 2017 to appeal TennCare's decision to no longer provide 24/7 private duty nursing care for Alison. As a result of these appeals, TennCare provided Alison with Continuation of Benefits ("COB") pending the results of her appeal. On December 1, 2017, TennCare summarily dismissed her appeals. [Attachment A to this Complaint.] The parties' counsel have negotiated an agreement to maintain current coverage pending the filing of this complaint and a hearing on the Plaintiff's motion for a preliminary injunction.

43.     In April 2017, in anticipation of her turning 21, Alison's parents had begun working with her TennCare MCO to come up with a plan of care with services provided through the ECF CHOICES program. On November 30, 2017, a coordinator for the ECF CHOICES Program, acting on behalf of the TennCare program, completed a proposed plan of care, known as an ECF CHOICES Person Centered Support Plan (PCSP). The plan, a copy of which was given to Alison's parents, is Attachment B to this Complaint.

12

44.     The PCSP noted that she was then receiving 24/7 nursing care at home and

documented the need for such care:

> Alison should be treated with respect and dignity. Supporters should be aware that Alison is aware of everything around her. She understands what's going on around her in her environment. Due to her visual impairment and seizure disorder it is important that she knows everything that is going to happen before it happens. Let Alison know you are going to touch her, change her, use a wipe, or apply medications. Alison should be suctioned when she coughs so she doesn't aspirate on her saliva. If she has a plug, her oxygen saturation can drop quickly and she can experience respiratory distress quickly. It is important to get the plug up and suctioned quickly. She receives respiratory treatments every 4 hours. She receives cough assists as needed to help her lungs expand and contract. Changes in the weather will bring on sickness for Alison. She had aspiration pneumonia two times this year. Alison may be fine and then suddenly goes into respiratory distress. Alison has seasonal allergies, the drainage will cause Alison to choke. The fluid will go into Alison's lungs and cause a respiratory crisis. Alison will need frequent suctioning. Alison must be closely monitored. Alison's oxygen is checked 1x a hour when sick. If she doesn't urinate in 8 hours, she will need to be catheterized. Alison usually receives catheterization 1x a week. She has frequent [urinary tract infections]. She gets breathing treatments twice a day and as needed. She has rods in her back and so when she is transported her back must be kept straight. If Alison starts to whine or fuss, talking to her will help determine what is wrong. When she grimaces or is fussy, she needs attention. It could be positioning, a wet diaper, cramps, bowel, menstrual symptoms, etc. She has seizures daily and VNS must be applied when in a prolonged seizure. She will sometimes get her arm or leg stuck in the railing of bed when she seizures. Alison's head also goes over to the right side, restricting her airway. Alison must be monitored for pressure sores. She is repositioned every 2 hours. Alison must be monitored around the clock including sleeping hours. …

[Attachment B to this Complaint.]

45.     TennCare's PCSP explains in poignant detail that, despite her severe medical

problems, her constant pain and discomfort, and the limitations that they impose, Alison Roan is

a remarkable person whose life is filled with loving, and being loved by, her family, caregivers

and friends:

> Alison is sweet and kind. She has a wonderful loving personality. She has an infectious laugh. She has spark, sass and humor. She likes jokes and music. She likes having books read to her. She likes to have her hair and nails done. She likes to cuddle… Alison is aware of her surroundings and she listens to everything. …Alison's family, nurses, teachers, therapists and friends are important to her. She wants to be included in conversations. She will blink to answer yes and no [to] questions or use simple arm

13

movements. ...If she is upset or hurting, ... she will answer yes when asked the correct question. It's important to Alison to be included in activities. Alison picks up on others' moods if they are frazzled or upset. It will cause her anxiety or stress if someone is in a bad mood. It is important to Alison to always know someone is with her and she is not alone. She needs to feel loved, cared for, and important...

*Id.*

46.     The intimate social relationships that Alison is able to maintain in her home, and that are documented in TennCare's PCSP, are important to her health as well as emotional wellbeing. These close relationships enable her nurses, who have been her longtime caregivers, to detect medical problems early based on Alison's behavior and emotions.

47.     On December 2, 2017, Alison's day shift nurse was reassigned to another case and Alison's family did not receive notice. As a result, Alison did not receive skilled nursing care that day. On December 3, 2017, Alison went into respiratory distress and was rushed to her local hospital by ambulance and placed in the Intensive Care Unit. The following day, she was transferred to Vanderbilt Children's Hospital because of their specialized resources and that hospital's lengthy experience caring for her and was discharged on December 8.

48.     According to Alison's attending pulmonologist, referring to Alison's private duty nursing as "home health nursing:"

> The acuity of Alison's home care requires 24 hour a day nurse coverage. The home care she receives would be equivalent to hospital intensive care unit care with 1 to 1 nursing support. A nursing facility or a caregiver without a nursing background cannot provide the medical care she needs within the home to prevent adverse events or the need for hospitalizations. The family is not medically trained and while they provide for Alison's care regularly, they are not trained to provide more emergent treatment. Without home health nursing, an event of mucus plugging or other respiratory complication would result in respiratory failure and death for Alison before emergency personnel could respond to a 911 call to the house. Decreasing her home health nursing hours will significantly increase her risk for morbidity and mortality and increase hospitalizations, and therefore 24 hours nursing is medically necessary to care for Alison.

[Declaration of Dr. Rebekah F. Brown, December 15, 2017, Attachment C to this Complaint].

49.     The TennCare PCSP offered to Alison's parents nonetheless limits the amount of nursing care she can receive in the home to 19 hours per day. On December 14, 2017, Defendants' counsel informed Plaintiffs' counsel that, based on TennCare rules, Alison would not be allowed to exceed that level of care if she remains in a non-institutional setting.

## G.  CLAIMS FOR RELIEF

50.     Plaintiff is a "qualified individual with a disability" as defined in 42 U.S.C. § 12131(2). She is an individual with a disability who meets the essential eligibility requirements for the TennCare program with reasonable modification to the rules, policies, and practices of that program.

51.     Defendants' agency, DFA, including its program the Bureau of TennCare, is a "public entity" for the purposes of Title II of the Americans with Disabilities Act (ADA) of 1990, 42 U.S.C. § 12131(1)(B), and the federal regulations promulgated thereunder.

52.     Title II of the ADA provides that no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by such an entity. 42 U.S.C. § 12132; 28 C.F.R. § 35.130.

53.     Without reasonable modification of the rules, policies, and procedures governing the TennCare program, Plaintiff will be forced to leave her family home and enter a restrictive, segregated institutional setting against the will of her and her family.

54.     Defendants' refusal to provide Medicaid funding for around-the-clock private duty nursing services that Plaintiff requires to avoid segregation in an institution and remain in the integrated home setting constitutes unlawful discrimination in violation of Title II of the ADA, 42 U.S.C. § 12132, and its implementing regulation, 28 C.F.R. § 35.130(d).

55.     Defendants have utilized criteria or other methods of administration that have the effect of subjecting Plaintiff to discrimination on the basis of disability, including unnecessary institutionalization, by failing to assess properly the services and supports that would enable Plaintiff to remain in her family home and by failing to ensure that she has access to Medicaid-covered services that will meet her needs in an integrated home setting, in violation of Title II of the ADA and its implementing regulations.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, Alison Roan, respectfully request that this Court grant the following relief:

A.     Assume jurisdiction over this action;

B.     Declare that Defendants, acting under color of state law, are violating Plaintiff's rights under Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131 *et seq.*;

C.     Preliminarily and permanently enjoin Defendants from reducing Plaintiff's home-based nursing services below 24 hours per day, 7 days per week for as long as she remains eligible for TennCare Medicaid benefits and those services remain medically necessary;

D.     Award reasonable attorneys' fees and costs as provided by 29 U.S.C. § 794a(b) and 42 U.S.C. §§ 1988 and 12133; and

E.     Order such further or additional relief as the Court deems equitable, just and proper.

16

DATED this 19th day of December, 2017.     Respectfully submitted,

 /s/ Christopher E. Coleman
Christopher E. Coleman TN BPR 24950
Gordon Bonnyman, Jr. TN BPR 2419
Kinika Young TN BPR 25777
TENNESSEE JUSTICE CENTER
211 7th Avenue, N., Ste. 100
Nashville, Tennessee 37219
Phone: (615) 255-0331
FAX: (615) 255-0354

*Counsel for Plaintiff*



## DECLARATION OF ROSEMARIE ROAN

I declare under penalty of perjury that, to the best of my information and belief, the factual statements in the foregoing Complaint are true and correct. Executed this 19th day of December, 2017, at Murfreesboro, Tennessee.

 

 

_____
Rosemarie Roan

*Conservator of Plaintiff Alison Roan*

18